DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Jason Klaas, appeals from a judgment of the Lorain County Court of Common Pleas, Juvenile Division, that terminated his parental rights to his minor child, R.K., and placed the child in the permanent custody of Lorain County Children Services ("LCCS"). We affirm.
 {¶ 2} R.K., born March 18, 1998, is the biological child of Kimberly King ("Kimberly") and Jason Klaas ("Jason"). At the time that LCCS initially became involved in this case, R.K. was living with Kimberly and her boyfriend. A half-sibling, not the biological child of Jason, was also living in the home. That child is not a subject of this action, but occasionally resided in the same home with R.K. and Kimberly during the pendency of this action.
 {¶ 3} In July 2000, Kimberly discovered bruises on R.K. and presented him at a hospital emergency room. The child had severe bruising in the genital area, legs and head. Surgery was required to remove a blood clot in the child's testicle. Kimberly, Kimberly's boyfriend, Jason and an older half-sibling all had access to the child during the period when the injuries were likely inflicted.
 {¶ 4} On July 21, 2000, LCCS filed a complaint, alleging that R.K. was an abused child, and seeking emergency temporary custody. Following adjudicatory and dispositional hearings, R.K. was found to be an abused child, and temporary custody was awarded to LCCS on September 14, 2000. R.K. was first placed in a foster home and later with relatives. Eventually, Kimberly's boyfriend was charged with child endangering in regard to this incident.
 {¶ 5} Case plans were established, requiring both Kimberly and Jason to attend parenting classes to learn non-violent forms of discipline; participate in drug and alcohol assessments, along with recommended treatments; and participate in visitation.
 {¶ 6} Then began a three-year odyssey in which R.K. lived with relatives twice, Kimberly three times, Jason twice, Jason's girlfriend once, and in LCCS placements three times. At the time of the last foster placement, Kimberly's whereabouts were unknown and Jason was incarcerated. Jason continues to be incarcerated, with an expected release date of December 2004.
 {¶ 7} Eventually, on March 31, 2003, LCCS moved for permanent custody of the child. A hearing was held, on August 5, 2003, at which Kimberly and Jason were represented by separate counsel, but neither was personally present. Jason's deposition was taken at the prison and his counsel introduced it into evidence at the hearing. Thereupon, the trial judge terminated the parental rights of Kimberly and Jason, and granted permanent custody of R.K. to LCCS.
 {¶ 8} Jason has timely appealed from that judgment and has assigned one error for review.
 Assignment of Error
"The trial court erred in granting Lorain County Children Services' motion for permanent custody based on a finding that permanent custody is in the minor child's best interest as the prosecution failed to meet its burden [of] proof requiring clear and convincing evidence. Consequently, the trial court's findings were against the manifest weight of the evidence."
 {¶ 9} Jason contends that the trial court's finding that it was in the best interest of R.K. to be placed in the permanent custody of LCCS was not supported by the manifest weight of the evidence.
 {¶ 10} When evaluating whether a judgment is against the manifest weight of the evidence in a juvenile court, the standard of review is the same as that in the criminal context. In reOzmun (Apr. 14, 1999), 9th Dist. No. 18983. In determining whether a criminal conviction is against the manifest weight of the evidence:
"The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 11} Moreover, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." Karches v. Cincinnati (1988), 38 Ohio St.3d 12, 19. Furthermore, "if the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment." Id.
 {¶ 12} Before a juvenile court can terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least twelve of the prior twenty-two months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and2151.414(B)(2); see, also, In re William S. (1996),75 Ohio St.3d 95, 99. Clear and convincing evidence is that which will cause the trier of fact to develop a firm belief or conviction as to the facts sought to be established. Cross v. Ledford (1954),161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 13} In this case, the trial court found that the child cannot and should not be placed with either parent within a reasonable time and also that it is in the child's best interest to terminate parental rights and award permanent custody to LCCS. Jason has challenged only the finding of the trial court as to the best interest of the child.
 {¶ 14} In making the determination that the grant of permanent custody to the agency is in the child's best interest, the trial court was required to:
"[C]onsider all relevant factors, including, but not limited to, the following:
"(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
"(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
"(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999; [and]
"(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C.2151.414(D)(1)-(4).[1]
 1. The interaction and interrelationship of the child.
 {¶ 15} As to the first factor, Jason testified in deposition that his family included a ten-year-old daughter who resides with her mother in Alliance, parents, aunts, uncles, and cousins. Jason points to evidence that he resided with Kimberly and R.K. for the first twenty-two months of the child's life and thereafter took him for weekend visits to the park, camping, to racing events, to car shows, and also stated that the child called him "Daddy." He points out that he was granted legal custody of R.K. on November 30, 2000, after making sufficient progress on his case plan.
 {¶ 16} Except for Jason's statement that R.K.'s half-sister missed him, there was no specific evidence of a continuing relationship between R.K. and other family members. Certainly, R.K. was placed for a short while with relatives while he was in the temporary custody of LCCS, but those relatives returned the child because they were unable to manage his behavior and there is no evidence otherwise of a continuing relationship between them. At the time of the permanent custody hearing no relatives were willing or able to assume custody of R.K. and none testified at the hearing. Jason testified that he presently communicates with his 10-year-old daughter, but there is no evidence of any communication by Jason with R.K. since June 2001. Moreover, R.K. was said to speak of his mother and half-brother, but not of his father.
 {¶ 17} The record also reveals that R.K. had to be removed from Jason's custody twice after the child's initial removal from his home; that Jason relapsed into drug use during a period when he was responsible for the child; that Jason has not had any contact with the child since June 2001, and that during these proceedings, Jason lost his job, became homeless, and was convicted of a criminal offense.
 {¶ 18} By the time of the permanent custody hearing, R.K. had been in foster care for one year. While the child had been returned from other placements because of biting, hitting, kicking, and, in general, being an angry child, R.K. is reportedly doing well with his current foster family. R.K. has been diagnosed with ADHD and takes medications for his impulsive behavior. He attends counseling sessions two or three times a week with a focus on behavior issues, foster care status, and family-role issues. He is reportedly cooperative in sessions and making progress. The foster family is interested in adopting him. Upon review, the evidence on this factor does not weigh in favor of Jason's position.
2. The wishes of the child.
 {¶ 19} On behalf of the five-year-old R.K., the guardian ad litem expressed the wishes of the child. She reported that it was in the best interest of the child to be placed in the permanent custody of LCCS.
 {¶ 20} The guardian ad litem indicated that Jason has only been sporadically involved in R.K.'s life and is not an appropriate caregiver. She visited the home of Jason, his girlfriend, and R.K., and concluded that Jason was not an involved parent. He let his girlfriend do most of the talking during the visit as to how they would raise the child and be a family. Jason "did not seem to have an idea of what a family should be. He was just going to let [his girlfriend] do it."
 {¶ 21} Jason complains that the guardian ad litem last visited with the child and himself in May 2002, and therefore could not raise recent concerns. However, the guardian ad litem was well aware of Jason's problematic history with the child, that the child was removed from his care twice after the initial intervention by LCCS, that no relatives were available for long-term placement, and that Jason would be incarcerated until the child was nearly seven years old.
 {¶ 22} Jason also complains that the guardian ad litem had no contact with paternal relatives; however, the LCCS caseworker contacted the relatives whose names were submitted by Jason as potential caregivers. She testified that no relatives were found to be willing to provide care for the child at the time of the permanent custody hearing and none testified at the hearing.
3. The custodial history of the child.
 {¶ 23} The third factor a court must consider in determining the best interest of the child is the custodial history of the child. Evidence on this factor clearly weighs in favor of LCCS. When R.K. was initially removed from the home in July 2000, he was initially placed in foster care and then with relatives. On November 30, 2000, Jason was found to have made significant progress on his case plan and obtained legal custody of the child. He had participated in parenting classes and received drug and alcohol assessments. No substance abuse treatment was recommended at that time.
 {¶ 24} Four months later, in March 2001, LCCS received referrals that Jason was abusing drugs, was homeless, was taking R.K. to bars with him and left the child with a babysitter without returning for several days. The babysitter called Kimberly who picked up the child and filed a police report. Upon request, Jason completed another assessment, tested positive for cocaine, and received a recommendation for intensive outpatient treatment. This treatment was never completed.
 {¶ 25} Jason admits he took R.K. to bars with him, but maintains that those were early afternoon visits to talk with friends and not to drink alcohol. Jason admits he used cocaine during this period, but claims he has remained sober while in prison and has addressed his substance abuse problems by participating in Alcoholics Anonymous ("AA") and Narcotics Anonymous ("NA"). Despite Jason's assurances, however, his ability to remain sober out of prison remains untested.
 {¶ 26} Jason attempts to excuse himself of responsibility for the event with the babysitter by claiming that he was only gone eighteen hours and had made arrangements for the child to stay with a babysitter. However, at the same time, Jason admits that he was using cocaine and alcohol on the trip. Moreover, Jason was obligated to select a responsible babysitter and advise her of his plans. By any measure, Jason's behavior at that time is questionable.
 {¶ 27} Kimberly had made significant progress on her case plan, and Jason verbally agreed to let the child remain with Kimberly while he was further assessed for substance abuse and began treatments. Within one month, however, Kimberly was arrested via secret indictment for child endangering.
 {¶ 28} Jason then took R.K. back with him. Within weeks, in June 2001, R.K. was discovered wandering around alone outside at 1:00 a.m. The police were called. Jason attempts to excuse himself from responsibility for this event by claiming that the three-year-old R.K. had been asleep, but knew how to open a door himself, and simply went outside. Since Jason knew R.K. was able to open a door, however, Jason's responsibility included accommodating this behavior so as to keep the child safe.
 {¶ 29} LCCS then sought an emergency order of custody and placed the child back with Kimberly. Kimberly received temporary custody of the child with the protective supervision of LCCS. Within six months, Kimberly was granted legal custody and protective supervision was terminated. Kimberly had completed the terms of her probation, obtained her GED, was participating in counseling, and actively seeking employment. R.K. was involved with Head Start and taking medication for behavioral issues.
 {¶ 30} For his part, Jason was homeless, unemployed, failed to follow through with recommended substance abuse treatment, and had become incarcerated. On December 11, 2001, he was charged with unlawful sexual conduct with a minor, in violation of R.C.2907.04(A), and interference with custody, in violation of R.C.2919.23(A)(1). He entered pleas of guilty to the charges and was sentenced, on January 3, 2002, to a term of three years on the first count and eight months on the second count, to be served concurrently. Jason was also designated as a sexually oriented offender. Jason is currently in prison on these charges.
 {¶ 31} In March 2002, LCCS reopened its case based on new referrals that R.K. had multiple bruises on his body. Kimberly agreed to allow relatives to care for the child, but within two months, relatives were not willing to continue caring for him because of his behavior. Kimberly signed a voluntary agreement permitting LCCS to have temporary custody of R.K. Kimberly tested positive for marijuana and traces of other illegal substances. She admitted she still used illegal drugs, but would not agree to complete any substance abuse treatment — even if it meant losing her children. She did not believe her drug use had any affect on her ability to parent. Instead, she believed that the behavioral problems of her children were the source of her problem.
 {¶ 32} In September 2002, temporary custody was formally sought by LCCS because Jason was incarcerated, Kimberly continued to struggle with substance abuse and could not keep the child safe from high risk behavior, and there were no approved relatives available for placement.
 {¶ 33} Since the fall of 2002, Kimberly has had no contact with R.K. and her whereabouts have remained unknown.[2]
Jason's last contact with R.K. was in June 2001. He has been in jail since January 2002, but has provided names of relatives for LCCS to explore as potential custodians of the child.
 {¶ 34} Jason contends that he maintained custody of the child for an extended period of time throughout the five years of the child's life. He points out that he lived with R.K. and Kimberly from R.K.'s birth until early 2000, and that he had legal custody of his son from November 30, 2000 until May 24, 2001. Jason citesIn re Smith, 9th Dist. No. 20711, 2002-Ohio-34 and In re: A.D.and M.D., 9th Dist. No. 02CA008090, 2002-Ohio-6032 for the proposition that the separations between parents and children cannot be held against a parent without considering the reasons for the separations and the implications on the child.
 {¶ 35} In Smith, the parent had made efforts to comply with her case plan and attempted to better herself and the home situation. In re: Smith, 9th Dist. No. 20711, at 10-11. The guardian ad litem observed a positive relationship between the parent and child and recommended against termination. Part of the reason for the period of separation in Smith was the agency's admitted effort to build a stronger case against the parent as opposed to any delay directly attributable to the parent. Therefore, in that case, the period of separation between parent and children was not properly held against the parent.
 {¶ 36} In A.D. and M.D., there was so little evidence regarding what transpired during the family's involvement with the agency, that conclusions regarding the reasons for the separation between the mother and her children could not be drawn. A.D. and M.D., 2002-Ohio-6032, at ¶ 25-26.
 {¶ 37} In the present case, Jason did not complete his case plan; had an unaddressed substance abuse problem and tested positive for cocaine while R.K. was in his care; was unsuccessful in two attempted reunifications with R.K.; became homeless and unemployed; had been convicted of the crime of unlawful sexual conduct with a minor, and had been designated as a sexually oriented offender. These reasons for the separations between Jason and R.K. are unlike those in Smith, and more probative than the evidence available in M.D. and A.D. They are, therefore, properly held against Jason.
4. The child's need for a legally secure placement
 {¶ 38} The fourth factor for consideration is whether the child is in need of a legally secure placement and whether it may be obtained without a grant of permanent custody to the agency. The evidence on this factor also weighs against Jason.
 {¶ 39} The caseworker testified that R.K. was in need of a legally secure placement and that one cannot be achieved without a grant of permanent custody to the agency. The guardian ad litem similarly reported that the best interest of the child would be served by placing the child in the permanent custody of LCCS.
 {¶ 40} Jason contends that the statement of the guardian ad litem that the child needed permanency in his life is insufficient evidence to establish this factor clearly and convincingly. The evidence on this point does not derive solely from the statement of the guardian ad litem, however, but is also supported by the fact that LCCS went far beyond the usual efforts to reunite R.K. with his parents. After his initial removal from the home, the child was reunited with Kimberly three times and Jason twice. All of these efforts were unsuccessful. Additional attempts to place the child with relatives were also unsuccessful, with those relatives surrendering the child back to LCCS.
 {¶ 41} During the three and one-half years that this action has been pending, R.K. was moved between placements at least ten times. On several occasions, he had to be removed from placements because the caretakers could not control his behavior. On the other hand, since he has been in his current foster placement and achieved a year of stability, he has done well. He is cooperative and making progress in his counseling sessions.
 {¶ 42} Jason contends that a legally secure placement may be achieved through a long-term foster placement. He relies on a reported statement by the current foster parents that, in their previous experience with adoption, they found continued contact with the biological parents to be favorable and would not oppose such contact in this case. Jason suggests that this means the child already has a stable long-term placement without granting permanent custody to LCCS. But, Jason misapprehends the nature of the statement by the foster parents. The statement was premised upon the adoption of the child, and did not convey a willingness to provide long-term foster care until Jason is released from prison. Indeed, the goal of long-term foster care is permanent placement of the child outside the home of the parent. In re:Efaw (Apr. 21, 1998), 4th Dist. No. 97CA49. The goal of long-term foster care is not reunification with parents. In re:Brown Children (Mar. 27, 1995), 5th Dist. No. 1994 CA 00234.
 {¶ 43} Jason also contends that a legally secure placement may be provided by relatives. However, no relatives were found to be willing and able to assume the care of the child at the time of the permanent custody hearing.
 {¶ 44} Despite claims by Jason that the agency's efforts focused on Kimberly, LCCS provided many services and several opportunities to Jason for reunification. LCCS referred Jason to parenting classes, referred him to substance abuse assessments twice, recommenced intensive outpatient treatment which Jason failed to complete, and permitted him to have temporary custody after the initial removal. LCCS had to remove the child from his care twice following attempted reunifications. The opportunities for reunification of parent and child are not endless.
 {¶ 45} Jason contends that the trial court should have considered that he has already made arrangements to take up residence with his mother upon his release from prison; has been sober and drug-free during his incarceration; is participating in AA and NA; has attended anger management classes and plans to attend parenting classes; has earned his GED while incarcerated; and is currently enrolled in business management classes at Hocking College.
 {¶ 46} To the extent that Jason has argued that the trial court failed to consider the evidence he has pointed to, we observe that there is no indication in the record that the trial court did not consider such evidence. The fact that the trial court failed to include reference to these matters in its judgment entry, does not mean that it failed to consider them. Therefore, in the absence of evidence to the contrary, we presume that the trial court considered all relevant evidence. See Statev. Coombs (1985), 18 Ohio St.3d 123, 125. While Jason's efforts at self-improvement are commendable, they do not compel the conclusion that the best interest of the child is served by keeping R.K. in temporary care until Jason is released from prison.
 {¶ 47} By the time of the hearing in this case, R.K. was five and one-half years old. Jason has not seen the child since June 2001, when the child was three. Based on Jason's anticipated release date, the child would be nearly seven years old before they could be reunited. This Court has previously stated, "A child has needs that cannot wait." In re: Hederson (1986),30 Ohio App.3d 187, 189.
 {¶ 48} The record reflects that the parents in this case were afforded numerous opportunities to regain custody of R.K. A case plan was developed which addressed the substance abuse issues of both parents, provided for parenting classes for both parents, and permitted the parents to maintain contact with the children through visitation. Following the initial removal from the home, at various points in time, the children were placed with relatives and returned to the parents several times — all of which efforts were unsuccessful. These facts support a finding that R.K. deserves a legally secure permanent placement that could only be achieved by a grant of permanent custody to LCCS.
 {¶ 49} Upon careful review of the record, this court cannot say that the jury clearly lost its way and created a manifest miscarriage of justice. Jason's assignment of error is overruled.
 {¶ 50} Jason's sole assignment of error having been overruled, the judgment of the trial court is affirmed.
Judgment affirmed.
Slaby, J. and Batchelder, J., concur.
[1] The factor set forth in R.C. 2151.414(D)(5) is not relevant in this case.
[2] Kimberly's last known residence had the electricity turned off. Kimberly had an extension cord running to a neighbor's home for a microwave and space heater. The house was reported to have a foul odor.